The Honorable John C. Coughenour

FILED ___ ENTERED
___ LODGED ___ RECEIVED
DEC - 6 2001      DJ
AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| F&G SCROLLING MOUSE, L L C , FERNANDO FALCON, and FEDERICO GILLIGAN, <br><br> Plaintiffs, <br><br> v. <br><br> KEY TRONIC CORPORATION, <br><br> Defendant. | CASE NO C99-995C <br><br> PLAINTIFFS' TRIAL BRIEF |

CV 99-00995 #00000346

## I.   INTRODUCTION

Fernando Falcon and Federico Gilligan are two inventor-entrepreneurs who discovered and developed a revolutionary new computer mouse. Their work on this concurrent pointing and scrolling ("CPS") mouse flew in the face of then current conventional wisdom regarding the feasibility and potential popularity of the product. In response to the skepticism of the industry, they not only proved their concept in several hardware and software embodiments, but also proved the business case for the enormous profit potential in their technology  The trade secrets defining this work were misappropriated by Key Tronic, Falcon and Gilligan's development

PLAINTIFFS' TRIAL BRIEF - 1

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

ORIGINAL

partner, and given by Key Tronic to Microsoft as a sacrificial lamb in Key Tronic's successful quest for a Microsoft keyboard contract that became Key Tronic's largest contract. Because of this misappropriation, Falcon and Gilligan's trade secrets were incorporated in the enormously popular Microsoft IntelliMouse®, which became the standard for mouse design in the industry.

## II.    FACTS THAT WILL BE PROVEN AT TRIAL

In meetings with IBM and Compaq, Falcon and Gilligan were told how these big original equipment manufacturers (OEMs) obtain mice to ship with their computers: they buy them from a vendor who has manufacturing capabilities. The OEMs told Falcon and Gilligan that their mouse idea was novel, that it had great potential, but that they needed to find a manufacturing partner. In 1993 they found such a partner in Honeywell. At least it appeared that way.

In June 1993 Falcon and Gilligan met with the Honeywell Keyboard Division at a Honeywell office in El Paso, Texas to discuss joint development of Falcon and Gilligan's mouse concept. They signed a non-disclosure agreement with Honeywell. They spent two days in meetings with Honeywell engineers and managers explaining their scrolling mouse technology. They were told that Honeywell would be their partner in developing their mouse and selling it to the big OEMs. But Falcon and Gilligan were not told that, just two weeks before their meeting, Honeywell had agreed to sell their Keyboard Division to Key Tronic Corporation.

In 1993, Microsoft's New Product Design Group also thought they were doing business with Honeywell on a massive new keyboard prototyping project. After an exhaustive selection process, Microsoft rejected lesser competitors, including Key Tronic, and chose the Honeywell Keyboard Division as its development partner. They awarded the contract to Honeywell only to find out two months later that Honeywell was selling its Keyboard Division to Key Tronic, the very company that Microsoft had earlier rejected as unacceptable in part because it was not

PLAINTIFFS' TRIAL BRIEF - 2

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

technologically savvy Microsoft responded to the announcement by denying Honeywell's request to assign the contract to Key Tronic.

When Key Tronic acquired Honeywell's Keyboard Division, Chuck Fauble – one of only a handful of Honeywell employees to survive the merger – was put in charge of Key Tronic's Research and Development group. He was also ordered to salvage Key Tronic's relationship with Microsoft and to obtain the keyboard contract from Microsoft.

Fauble was present at the initial scrolling mouse demonstrations presented by Falcon and Gilligan at Honeywell. It is his signature that is on their non-disclosure agreement. He knew that Honeywell considered the scrolling mouse technology to be more than twice as innovative and commercially valuable as any other mouse technology in its possession. It was Chuck Fauble who assigned engineering staff at Key Tronic to work with Falcon and Gilligan to develop advanced prototypes of the scrolling mouse. It was Fauble who urged Falcon and Gilligan to allow him to demonstrate the prototypes to Microsoft, and it was Fauble who sought an audience with Microsoft's mouse development team to discuss Key Tronic's technical capabilities.

The meeting occurred. Key Tronic brought Falcon and Gilligan's mouse and the prototypes were never seen by Key Tronic again. Shortly thereafter, Microsoft developed and produced a mouse incorporating Falcon and Gilligan's trade secrets, a mouse that became the industry standard.

But neither Falcon nor Microsoft got the full story from Fauble. Fauble never told Falcon and Gilligan that Microsoft considered Key Tronic a competitor rather than a potential partner in the mouse market. Fauble never told them that Key Tronic was working feverishly to win a massive keyboard manufacturing contract from Microsoft and that Microsoft's keyboard staff

PLAINTIFFS' TRIAL BRIEF - 3

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

would be attending this meeting. Fauble also never told them that Key Tronic had decided to jettison the scrolling mouse project in order to enhance its prospects for doing business with Microsoft, who was not likely to sign a joint development keyboard contract with a company that competed with it in the mouse market

For its part, Microsoft was never informed that the scrolling mouse technology did not belong to Key Tronic, that Key Tronic obtained the technology under the terms of a non-disclosure agreement with Falcon and Gilligan; or that the permission to disclose the mouse prototypes was conditioned by Falcon and Gilligan on the execution of a separate confidentiality agreement between Microsoft and Key Tronic with respect to the scrolling mouse technology, an agreement that Key Tronic never attempted to obtain.

Fauble and Key Tronic withheld critical information from Falcon, Gilligan and Microsoft in order to serve their own interests  Only months after the disclosure, Key Tronic won the $150 million keyboard manufacturing contract from Microsoft, the largest contract in the company's history. For his efforts, Fauble received a raise and stock options from Key Tronic's Board of Directors  Microsoft received unique and valuable mouse technology that eventually became incorporated in a new product called the Microsoft IntelliMouse®  That disclosure, and abandonment of Key Tronic's mouse program, were key to overcoming Microsoft's stated concerns and obtaining the keyboard contract for Key Tronic

Falcon and Gilligan received nothing for their years of work and dedication, other than personal ruin from the emotional and financial cost of the project after it was stolen from them  The proprietary materials they provided to Key Tronic were never returned and the new and exciting scrolling mouse prototypes disappeared  Creative and iconoclastic inventors like Falcon

PLAINTIFFS' TRIAL BRIEF - 4

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

and Gilligan are just the people the trade secret statutes at issue in this case are designed to protect

Through their credibility and a clear evidentiary trail, Plaintiffs will prove that the combination of elements comprising their scrolling mouse technology was unknown in the industry in 1993, that it was disclosed in confidence to Key Tronic; that Key Tronic improperly gave it to Microsoft; and that it ended up in the Microsoft IntelliMouse®.

### III. ARGUMENT

**A. At the Time of the Misappropriation, the Falcon Scrolling Mouse Technology Contained Valuable Trade Secrets**

**1. The Falcon Trade Secrets Were Not Generally Known in the Mouse Industry**

The parties disagree whether the laws of Minnesota or Washington apply to this action. Although the court has been briefed on this issue, *see, e g* Plaintiff's Memorandum in Opposition to Key Tronic's Motion for Partial Summary Judgment on Plaintiff's Damage Theories, it has not ruled  However, with respect to the definition of "trade secret", the Minnesota and Washington versions of the Uniform Trade Secrets Act are in accord. *Cf* RCW 19 108 010 and Minn. Stat § 325C 01.

A trade secret is information that derives value from not being generally known or readily ascertainable by those who can obtain economic value from its use. *Id*  The relevant time period for this test is the time of the misappropriation  Plaintiffs will prove that the time of the misappropriation falls between the time when the prototypes were completed in November of 1993 and the time when the project was abandoned by Key Tronic on February 4, 1994  Therefore, anything that was learned about the structure, function and operation of scrolling mice or about the Microsoft Windows operating system after February 4, 1994 cannot be applied in

PLAINTIFFS' TRIAL BRIEF - 5

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

hindsight to known information of that earlier time to conclude that any trade secret was generally known before that date. Plaintiffs will argue that any expert opinion testimony offered on what was known or readily ascertainable in the mouse manufacturing industry in late 1993 should be free from the taint of later obtained knowledge or experience.

Plaintiffs will present evidence that their trade secrets comprise not only the individually described elements of their technology, but also the particular combination of those elements, combinations that in some cases ran counter to the conventional wisdom of the industry. Of course, mere evidence that a particular individual element of a trade secret as generally known does not establish that a particular combination of those elements was generally known or readily ascertainable to a defendant. *Boeing Co v Sierracin Corp*, 108 Wn 2d 38, 50, 738 P.2d 665, 675 (1987) ("A trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere. Such a burden would be insurmountable since trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets."); *Machen, Inc v. Aircraft Design, Inc*, 65 Wn App 319, 327, 828 P 2d 73 (1992) (combination must not be readily ascertainable to those in the industry). Therefore, unless there is a preponderance of persuasive evidence that there was a specific teaching (in the information that was generally known to the mouse manufacturing industry in 1993) to combine the trade secrets in the same way that Falcon and Gilligan did, then the trade secret combinations were not generally known.

### 2. The Falcon Trade Secrets Were Maintained in Secrecy

Trade secrets also must have been subject to efforts that were reasonable under the circumstances to maintain their secrecy. RCW 19.108.010(4)(b), Minn. Stat § 325C 01 Subd. 5(ii). The law recognizes that inventors need to be able to explain their ideas to potential

PLAINTIFFS' TRIAL BRIEF - 6

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

licensees and service providers; therefore absolute secrecy is not required. *Lasermaster Corp v Sentinel Imaging*, 931 F Supp. 628, 635 (D Minn. 1996) ("[A]bsolute secrecy is not required, the confidential measures must be reasonable under the circumstances"); *Precision Molding & Frame v Simpson Door Co*, 77 Wn App 20, 28, 888 P.2d 1239 (1995) ("we agree with Precision that relative secrecy is the proper standard under the statute"). Since the inquiry is into only what is reasonable under the particular circumstances of the trade secret owners, written confidentiality agreements are not required to preserve secrecy. Restatement (Third) of Unfair Competition § 41(b) (1995).

The Plaintiffs will prove that their scrolling mouse technology was conceptualized in 1991-92 with the initial proof-of-concept prototype (the "DOS prototype") operating with selected applications running in the MS-DOS operating system. When the DOS prototype was demonstrated to potential commercial partners, it was for the purpose of explaining the idea of a concurrent pointing and scrolling ("CPS") mouse. To the extent that these demonstrations revealed anything about the underlying technology, they were protected by either written or oral understandings between the parties that the presentation was made for the limited purpose of evaluating the interest of the parties in a potential development partnership.

A second prototype was built by Falcon and Gilligan in 1993 during the time of their contractual relationship with Key Tronic. This new prototype (the "Windows prototype") was a more complete expression of the CPS mouse technology. Critically, the Windows prototype was the first embodiment of a CPS mouse by Falcon and Gilligan that incorporated the supplemental scrolling mechanism in a standard mouse body, positioned and calibrated the scrolling mechanism for the desired control resolution, and provided the user with universal CPS capability in program applications running on the Microsoft Windows operating system. The

PLAINTIFFS' TRIAL BRIEF - 7

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

evidence will show that the Windows prototype was the model on which two commercial prototypes (the "Key Tronic prototypes"), assembled jointly by Falcon and Key Tronic, were based. The evidence will also show that neither the Windows prototype nor the Key Tronic prototypes were shown to a potential customer unless a written non-disclosure agreement had been executed, a policy that more than meets the requirement of reasonable efforts to maintain secrecy.

### B.   The Falcon Trade Secrets Were Misappropriated By Key Tronic

As with the definition of a trade secret, the Minnesota and Washington versions of the Uniform Trade Secrets Act are in accord with respect to the definition of "misappropriation." *Cf* RCW 19.108.010 and Minn. Stat. § 325C.01. "Misappropriation" means the disclosure or use of a trade secret of another without express or implied consent by a person who at the time of the disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. *Id.*

#### 1.   Key Tronic Owed a Duty to Plaintiffs to Maintain the Secrecy of the Trade Secrets

The parties agree that Falcon and Gilligan executed a Proprietary Information Agreement - Bilateral (the "Agreement") with the Honeywell Keyboard Division in May of 1993, only weeks before an announcement that it would be purchased by Key Tronic Corporation. In various papers filed with the Court, Key Tronic argued that it is not bound by the Agreement (Agreed Pretrial Order at 4) and that it acted in accordance with the terms of the agreement (Key Tronic Motion for Summary Judgment, March 9, 2000, DENIED by Order of April 5, 2000). Neither position changes the content of the December 7, 1993 letter from Key Tronic to Falcon and Gilligan in which permission under the Agreement is requested by Key Tronic to

PLAINTIFFS' TRIAL BRIEF - 8

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

demonstrate the CPS technology to Microsoft. The requested permission was conditionally granted by Falcon and Gilligan, predicated on Key Tronic obtaining a non-disclosure agreement from Microsoft that specifically protected the Falcon technology. It is undisputed that Key Tronic never obtained such an agreement.

### 2. Key Tronic Disclosed the Falcon Trade Secrets to Microsoft

The Plaintiffs' evidence will show that on December 7, 1993 Key Tronic was preparing for a meeting on December 8, 1993 with the mouse development group at Microsoft, and that it intended not only to discuss the Falcon technology, but also to demonstrate it at this meeting (Key Tronic will not dispute that only six months earlier it had been informed that, from Microsoft's perspective, it was not a "technically savvy" company, particularly with respect to its ideas about mouse technology.) The evidence will show that the Key Tronic prototypes were modified versions of an existing Key Tronic product referred to as the Hawley mouse, that contemporaneous notes record that a Hawley mouse was present at the meeting; and that the Key Tronic prototypes were not seen again at Key Tronic after this meeting. Further, Key Tronic has no explanation why it cut off communication with Falcon and Gilligan after December 8, 1993; why it misled Falcon and Gilligan by initially denying that any meeting with Microsoft ever occurred; or why it suddenly dropped the Falcon mouse project less than two months later without making any further efforts to identify commercial interest in the CPS mouse technology

### C. The Microsoft IntelliMouse® is a CPS Mouse that Uses the Misappropriated Falcon and Gilligan Trade Secrets

The Falcon technology ultimately ended up in the IntelliMouse® family of mice produced by Microsoft. The Plaintiffs do not contend that the IntelliMouse® products are identical to the Windows prototype or the Key Tronic prototypes. The law does not require such proof for a plaintiff to prevail. Restatement (Third) of Unfair Competition §40, comment (c)

PLAINTIFFS' TRIAL BRIEF - 9

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

(1993) ("The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability. Similarly, the actor need not use the trade secret in its original form. Thus an actor is liable for using the trade secret with independently created modifications if the result is substantially derived from the trade secret."); *Reingold v Swiftships Inc.*, 126 F.3d 645, 651 (5th Cir. 1997), *American Can Co v Mansukhani*, 742 F 2d 314, 328-329 (7th Cir. 1984).

The Plaintiffs' evidence will show that the combination of structural and functional elements that give the IntelliMouse® products their CPS capability were derived from the Falcon technology given to Microsoft by Key Tronic and that in each instance where a design choice had to be made, Microsoft made the same design choice as Falcon, even where such a choice was contrary to the conventional wisdom of the time. Microsoft itself has admitted that the IntelliMouse® products contain the CPS technology; that the existing mouse research at Microsoft in 1993 did not address CPS technology, and that the development of the IntelliMouse® (code named "Magellan") began in 1994, only months after the December 8, 1993 meeting with Key Tronic

### D.   Plaintiffs are Entitled to Recover Damages from Key Tronic that Were Caused by Key Tronic's Misappropriation

Although there may be some differences in the trade secret laws of Washington and Minnesota, the statutes are in accord to the extent that they both provide for the recovery of damages for the misappropriation of trade secrets as follows

> Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

PLAINTIFFS' TRIAL BRIEF - 10

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

RCW 19.108.030(a)(1999), Minn. Stat. §325 03(a)(1999). In answering the question. What was actually lost by Falcon and Gilligan when Key Tronic gave the CPS technology to Microsoft? the evidence will show that Falcon and Gilligan were not mouse manufacturers They did not expect to actually build commercial mice and draw profit from the ability to sell them at a higher price than the production cost That was what Key Tronic would have provided The records of communication between Key Tronic and Falcon and Gilligan demonstrate that the benefit to Falcon and Gilligan from the Key Tronic relationship would be in the form of licensing revenue Therefore, the actual loss caused by Key Tronic's misappropriation is determined by the amount of licensing revenue the trade secrets would have generated had they not been exterminated by Key Tronic.

Plaintiffs have taken note of the Court's "serious reservations" about recovering Microsoft's profits on sales of the IntelliMouse® from Key Tronic (Order of 12/06/00). Regardless of whether the Plaintiffs are persuasive on the unjust enrichment element of their damages claim, the calculation of actual loss is unaffected The calculation of lost licensing revenue uses the sales data of the IntelliMouse® as a benchmark, but is *not* a claim against Microsoft's profits Rather, the IntelliMouse® sales figures and market share data are used as guideposts in determining the size of the total market for CPS mice from December, 1993 to the present. The determination of actual loss of licensing revenue is based on licensing a specified portion of the total CPS mouse market, a portion which may or may not include Microsoft.

Plaintiffs will also present damages calculations based on unjust enrichment These have significance to the extent that the Plaintiffs' actual loss does not fully compensate them for the misappropriation *Id* Plaintiffs will present evidence of the unjust enrichment damages received by Key Tronic as a result of the Nexus keyboard contract sales. Plaintiffs believe that separate

PLAINTIFFS' TRIAL BRIEF - 11

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001

consideration of this quantum of damages is appropriate in the event that the jury determines a lesser value for actual loss than that proposed by the Plaintiffs

## IV. CONCLUSION

The evidence presented by F&G will show that: (1) Falcon and Gilligan owned valuable trade secrets, (2) the trade secrets were disclosed in confidence to Key Tronic; (3) Key Tronic misappropriated the trade secrets and breached the duty of good faith and fair dealing it owed to Falcon and Gillian; and (4) Falcon and Gilligan were significantly harmed by Key Tronic's misappropriation and breach of duty.

DATED this 6th day of December, 2001.

Respectfully submitted,

NIRO, SCAVONE, HALLER & NIRO
Raymond P. Niro
Paul K. Vickrey
Michael P. Mazza
Richard B. Megley, Jr.
Gregory P. Casimer
181 West Madison Street, Suite 4600
Chicago, IL 60602-4515
(312) 236-0733

SUMMIT LAW GROUP PLLC

By _____
Ralph H. Palumbo, WSBA No. 04751
Philip S. McCune, WSBA No. 21081

Attorneys for Plaintiff F&G Scrolling Mouse, L L C

PLAINTIFFS' TRIAL BRIEF - 12

SUMMIT LAW GROUP PLLC
1505 WESTLAKE AVENUE NORTH, SUITE 300
SEATTLE, WASHINGTON 98109-3050
Telephone (206) 676-7000
Fax (206) 676-7001