```
____  FILED     _____ ENTERED
____  LODGED    _____ RECEIVED

        MAY 1 3 2002

            AT SEATTLE
        CLERK U.S. DISTRICT COURT
    WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

F&G SCROLLING MOUSE, L.L.C.,
FERNANDO FALCON, and FEDERICO
GILLIGAN,

        Plaintiffs,

    v.

KEY TRONIC CORPORATION,

        Defendant.

CASE NO. C99-995C

ORDER

Following a jury verdict on December 20, 2001, and the Court's entry of judgment on the verdict on January 2, 2002, the following three post-trial motions are presently before the Court: (1) Defendants' Renewed Motion for Judgment as a Matter of Law (Dkt. No. 403); (2) Defendant's Motion for New Trial (Dkt. No. 400); and (3) Plaintiffs' Motion to Amend Judgment (Dkt. No. 393). Having considered the parties' submissions in support of the motions and determined that oral argument is unnecessary, the Court finds as follows.

## I. JUDGMENT AS A MATTER OF LAW

The legal standard for judgment as a matter of law is set by Rule 50, which permits the Court to

433

1    find against a party on an issue when "a party has been fully heard on an issue and there is no legally

2    sufficient evidentiary basis for a reasonable jury to find for the party on that issue." Fed. R. Civ. P.

3    50(a)(1). Much like summary judgment, the determination of this motion requires the Court to view the

4    evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in

5    favor of that party. "Judgment as a matter of law is proper if the evidence, construed in the light most

6    favorable to the non-moving party, allows only one reasonable conclusion and that conclusion is

7    contrary to that reached by the jury." Acosta v. City and County of San Francisco, 83 F.3d 1143, 1145

8    (9th Cir. 1996) (citing Vollrath Corp v. Sammi Corp., 9 F.3d 1455, 1460 (9th Cir. 1993)). In the present

9    case, the jury returned a verdict in favor of F&G on both the misappropriation of trade secret and breach

10   of contract causes of action and awarded damages of $16,500,000. (See Verdict Form, Dkt. No. 372

11   and Porter Decl. Ex. A.)

12           A. Misappropriation of Trade Secrets

13               1. Existence of Trade Secrets and Publication of F&G's Patents

14

15           Washington law requires that the alleged trade secret owner show that the secret derives

16   independent economic value from not being generally known to, or readily ascertainable by, other

     persons and that the owner has taken reasonable efforts to maintain its secrecy. See Wash. Rev. Code
17
     § 19.108.010(4). At trial, the plaintiffs focused their efforts on the "virtual pointing" and "concurrent
18
     pointing and scrolling" secrets, describing them as the "essence" of their whole invention, and only
19
     mentioned in passing the other alleged trade secrets listed in their Trial Exhibit A-18 (Porter Decl. Ex.
20
     D) and Jury Instruction No. 14 (Dkt. No. 376). F&G presented substantial evidence showing that the
21
     virtual pointing and concurrent pointing and scrolling ideas added value to contemporaneous mouse
22
     technology and that they made efforts, through non-disclosure agreements, to protect the secrecy of their
23
     ideas.
24

25           F&G contended at trial that Key Tronic improperly disclosed their trade secrets to Microsoft in a

26   ORDER – 2

1  December 8, 1993, meeting.  The following year, the inventors received two patents, one in May and

2  one in December.  (See Porter Decl. Ex. E.)  Evidence presented also showed that Microsoft did not

3  begin its IntelliMouse project until late 1994.  (Tr. at 318-19.)  The time frame of these events is

4  important because the Ninth Circuit has held that the disclosure of trade secrets in a patent destroys the

5  property rights in those secrets.  See Henry Hope X-Ray Prods., Inc. v. Marrion Carrel, Inc., 674 F.2d

6  1336, 1342 (9th Cir. 1982).  Here, the May 17, 1994, patent issued well before Microsoft began its work

7  on the IntelliMouse project, and the second patent issued roughly contemporaneously with it.  Thus, any

8  trade secrets contained in the patent were available to the public at that time, eliminating the effects of

9  any prior misappropriation subsequent to that date.  Key Tronic contends that Plaintiffs focused almost

10  exclusively on their trade secrets of "concurrent pointing and scrolling" and "virtual pointing."  Because

11  both of these concepts, as well as virtually every other trade secret claimed by the plaintiffs, was

12  disclosed in the two 1994 patents (see highlighted patents, Porter Decl. Ex. E), it is clear, as a matter of

13  law, that any valid trade secrets owned by F&G were destroyed as of mid-May 1994, or December

14  1994, at the latest.

15       Key Tronic urges the Court to find that an alleged misappropriator may use improperly acquired

16  trade secrets with impunity as long as the information is disclosed in a patent at a later date.  Although

17  Washington courts have not ruled on this issue, Defendant argues that they would follow California law.

18  California and other jurisdictions have held that once trade secrets have been divulged in a patent, the

19  public, including anyone who acquired the information prior to the issuance of the patent, is free to use

20  them.  The Court, however, is not willing to take the dramatic step of determining this issue of first

21  impression under Washington law.

22       Although the Court agrees that the issuance of the patents destroyed any trade secrets that F&G

23  had established, this does not alter the jury's finding of liability for trade secret misappropriation.  The

24  sole focus of Plaintiffs' misappropriation theory was the disclosure of the trade secrets by Key Tronic at

25

26  ORDER – 3

1   its December 1993 meeting with Microsoft. Because this meeting pre-dated the issuance of the first

2   patent by over five months, the Court's finding that the trade secrets were ultimately destroyed does not

3   alter the finding of misappropriation against Key Tronic.

4                           2. Permission to Disclose Trade Secrets

5           The key to the plaintiffs' misappropriation claim is Key Tronic's alleged disclosure of the trade

6   secrets without F&G's consent. The evidence presented at trial showed that F&G did give their

7   conditional consent for Chuck Fauble, Key Tronic's Vice President of Research and Development, to

8   disclose the scrolling mouse concept and prototypes to Microsoft in a facsimile communication the day

9   before the meeting took place. The disclosure authorization was conditioned on Key Tronic "enter[ing]

10  into a non disclosure agreement with Microsoft Corporation respect [sic] to the information received

11  from Key Tronic about the Scrolling Mouse technology." (Porter Decl. Ex. D, Trial Ex. 52.) Key

12  Tronic contends that this condition was satisfied because a 1990 non-disclosure agreement with

13  Microsoft covered the mouse technology. Plaintiffs argued that they intended a separate non-disclosure

14  agreement specific to the scrolling mouse as a result of concerns about Microsoft's non-disclosure

15  practices. Because Key Tronic never obtained such an agreement, F&G contends its disclosure

16  authorization was void. Evidence was presented at trial that showed F&G had seen Microsoft's

17  standard non-disclosure agreement and found it to be insufficient (see Tr. at 158-59, 327-28, 448-50),

18  and it is reasonable that the jury evaluated these facts and found that the conditions F&G placed on their

19  disclosure authorization had not been satisfied by Key Tronic.

20                          3. Disclosure of Trade Secrets to Microsoft

21

22          Regarding the essential element of disclosure of F&G's trade secrets, Key Tronic again makes

23  the argument that F&G presented no direct evidence that it disclosed the scrolling mouse technology to

24  Microsoft during the December 8, 1993 meeting. There is no direct evidence of the alleged disclosure,

25  but Plaintiffs did present substantial circumstantial evidence which was sufficient for the jury to find in

26  ORDER – 4

1   their favor.  It is well known that trade secret misappropriation is rarely proved by direct evidence, <u>see,</u>

2   <u>e.g., Eden Hannon & Co. v. Sumitomo Trust & Banking Co.</u>, 914 F.2d 556, 561 (4th Cir. 1990), and

3   because the jury was instructed that it could base its verdict on both direct and circumstantial evidence,

4   its ultimate conclusion on liability is not flawed because of a lack of direct evidence of

5   misappropriation.  Plaintiffs presented substantial circumstantial evidence, summarized in their

6   Opposition brief at 9-10, from which the jury could reasonably infer that the alleged misappropriation

7   took place.  Under the proper Rule 50 standard, the Court must decline to substitute its judgment for that

8   of the jury when substantial evidence supports the verdict.  Thus, the verdict of liability for

9   misappropriation of trade secrets remains in tact.

10   B. Breach of Contract

11   F&G's second theory of liability involved the breach of a non-disclosure agreement ("NDA")

12   between them and Key Tronic.  The only such agreement Plaintiffs testified about was a written NDA

13   between F&G and Honeywell's keyboard division.  This agreement was signed in May 1993,

14   approximately two months before Key Tronic purchased the keyboard division from Honeywell.  The

15   written NDA specifically provides that "[t]his agreement may not be assigned or transferred without the

16   express written consent of both parties.  Any attempted assignment or transfer without such written

17   consent is void." (Porter Decl. Ex. D, Trial Ex. 53 ¶12.)

18   It is undisputed that neither F&G nor Honeywell consented in writing to the transfer or

19   assignment of the NDA.  Instead, F&G relied on the fact that Chuck Fauble, as the Director of

20   Sales/Marketing of Honeywell's keyboard division, had signed the agreement and later went to work for

21   Key Tronic as Vice President of R&D, Key Tronic purchased the keyboard division, and Fauble

22   continued to be the primary contact for the F&G mouse project.  Furthermore, Fauble made several

23   references, particularly when seeking permission to disclose the mouse technology to Microsoft in a

24   December 7 letter, to "our Non-disclosure agreement with your Company." (<u>See</u> Porter Decl. Ex. D,

26   ORDER – 5

1  Trial Ex. 51.) Based on these facts demonstrating that both F&G and Key Tronic, through its agent

2  Fauble, understood the written NDA to apply to the disclosure of F&G's mouse technology, the jury had

3  substantial evidence on which to base its verdict on the breach of contract claim. The evidence

4  supported the conclusion that Key Tronic was bound by the written agreement and judgment as a matter

5  of law is therefore unwarranted.

6      C. Damages

7          1. Unjust Enrichment

8
9          Key Tronic maintains that because the primary contract between it and Microsoft regarding the

10  Nexus keyboard project was signed in September 1993, no quid pro quo for the disclosure of the

11  scrolling mouse trade secrets was possible. There is, however, sufficient evidence to support the jury's

12  finding of unjust enrichment. A memo to Chuck Fauble in late November 1993 indicated that Key

13  Tronic still perceived that Microsoft had doubts about its ability to handle the large keyboard contract

14  (see McCune Decl. Ex. B, Trial Ex. 61; Tr. at 340), and the actual manufacturing contract was not

15  signed until early 1994, after which Microsoft rescinded its stop work order (see id. Ex. B, Trial Ex. 62;

16  Tr. at 341). Because there was substantial evidence for the jury to conclude that the alleged

17  misappropriation played some role in the finalization of the keyboard contract, judgment as a matter of

18  law on unjust enrichment damages is not warranted.

19          2. Actual Damages

20          In addition to unjust enrichment, F&G sought actual damages for the alleged misappropriation in

21  the amount of either the royalty or license they would have been paid for the scrolling mouse

22  technology. Key Tronic claims that this damages theory is based on speculation and conjecture because

23  F&G's expert did not consider (and did not even know) the fact that F&G had solicited several

24  corporations but had failed to obtain a license. Further, it contends that the formulas used by Joseph

25  Gemini to calculate license royalties are wildly speculative and are improperly based on 50% of the

26  ORDER – 6

1  worldwide mouse market (Microsoft's share). Finally, Key Tronic argues that the Court should
2  disqualify Joseph Gemini as an expert witness because of his inexperience with license and royalty
3  negotiations.

4      Upon reviewing the evidence presented, the Court finds that there were sufficient facts for the
5  jury to find that the "concurrent pointing and scrolling" and "virtual pointing" secrets did add substantial
6  value to mouse technology available in late 1993. The secrets therefore had value to a company such as
7  Microsoft which planned to incorporate this technology into its mouse product. In addition, the Court
8  declines to disqualify Gemini's opinion testimony. It is common for accountants to work as peripheral
9  advisors in license negotiations, and this fact alone does not reflect negatively on his ability to render an
10  expert opinion with respect to license and royalty rates. In sum, the Court finds that as a matter of law,
11  there is sufficient evidence, when viewed in F&G's favor, to support an award of actual damages.

12      The Motion for Judgment as a Matter of Law is DENIED.

13

14

15                          **II.  MOTION FOR NEW TRIAL**

16      The Court may grant a new trial on any or all of the issues under Rule 59 "for any of the reasons
17  for which new trials have heretofore been granted in actions at law in the courts of the United States."
18  Fed. R. Civ. P. 59(a). Such reasons include an excessive jury award and a verdict that is either contrary
19  to the clear weight of the evidence or was substantially influenced by evidentiary errors. See Baker v.
20  Delta Air Lines, 6 F.3d 632, 646 (9th Cir. 1993); Fenner v. Dependable Trucking Co., 716 F.2d 598,
21  602-03 (9th Cir. 1983).

22

23      A. Verdict Against the Clear Weight of the Evidence and Excessive Damages

24      Here, Key Tronic has merely reiterated and highlighted the arguments submitted in its Renewed

25

26  ORDER – 7

1    Motion for Judgment as a Matter of Law. As discussed above, the Court granted the motion in two

2    limited respects. First, it held that F&G had only established the existence of two trade secrets,

3    "concurrent pointing and scrolling" and virtual pointing," and that they were both destroyed by the

4    issuance of the patents in 1994. Because this finding does not alter the validity of the jury's verdict

5    regarding misappropriation, it does not present grounds for a new trial. Second, the Court held that the

6    plaintiffs' attempt to seek actual damages was not supported by substantial evidence, precluding a

7    favorable finding on that issue by the jury. Because the jury's ultimate award of damages was not

8    specifically broken down based on actual damages or unjust enrichment, the Court has no way of

9    knowing whether the jury based its award on one or the other, or both. Nonetheless, the plaintiffs'

10   expert testified that an award of damages for unjust enrichment based on Key Tronic's profits from the

11   Nexus keyboard contract would be reasonable if it was between $16,222,000 and $20,700,000. Because

12   the jury's ultimate award of damages, $16,500,000, was within this range and the Court found there to

13   be substantial evidence to support unjust enrichment, a new trial limited to damages is not warranted

14   even though the Court has ruled that there were no actual damages from the misappropriation and

15   breach of contract.

16

17           B. Evidentiary Rulings – Improper Exclusions

18

19                   1. ProAgio Mouse Testimony and Demonstration

20           The Court struck the testimony and did not permit Professor Buxton's demonstration regarding

21   the ProAgio Mouse, which was allegedly on the market in mid-1994, on the basis that its prejudicial

22   effect outweighed the probative value. Key Tronic argues this evidence was critical because it was a

23   primary means of rebutting the plaintiffs' circumstantial evidence claim that the misappropriation was

24   the only way Microsoft could have obtained concurrent pointing and scrolling technology. If the

25   ProAgio was on the market prior to the IntelliMouse project, then Microsoft could have gained this

26   ORDER – 8

1  information from it.

2      Mr. Buxton's testimony and description of the ProAgio would have followed his description of a

3  series of mouse and mouse-like devices, most if not all of which pre-dated the alleged misappropriation.

4  Thus, Buxton's testimony may well have confused the jury regarding the pre- and post-misappropriation

5  devices and it appears to have been cumulative as well. Another witness, Mr. Kang, had already

6  testified about the ProAgio mouse at another point in the trial, further underscoring the cumulative

7  nature of Defendant's attempt to introduce Buxton's testimony on the subject. As a result, the Court

8  finds that under the correct Rule of Evidence 403 standard, the risk of prejudice from Buxton's

9  testimony and demonstration regarding the ProAgio mouse "substantially outweighed" its probative

10 value.

11      2. Microsoft Performance Test

12

13      This document, dated May 1995, appeared to show that Microsoft used the ProAgio mouse, or a

14 simulation of it, when developing its IntelliMouse. (See Porter Decl. Ex. B, Trial Ex. 112.) The Court

15 sustained an objection to it on the grounds of relevance, specifically the date. Because the document

16 described tests that occurred well after the misappropriation and the initiation of the IntelliMouse

17 project, it does not tend to make the occurrence of the misappropriation any less likely and was

18 therefore properly excluded.

19

20      C. Evidentiary Rulings – Improper Admissions

21      1. Burton and Fauble Videotape Depositions

22

23      Key Tronic argues that the Court's refusal to include its counter-designations with the plaintiffs'

24 presentation of the video depositions of Michael Burton and Chuck Fauble was prejudicial error. It

25 argues that the lack of context misled the jury and ultimately prejudiced it by forcing a repeated

26  ORDER – 9

1  presentation of F&G's designations. Because the defendant did ultimately present the video depositions
2  to the jury with its desired contextual counter-designations, the Court finds that this was not a violation
3  of the "fairness" standard set forth in Federal Rule of Evidence 106 and Federal Rule of Civil Procedure
4  32(a)(4). Even it if was an error, it was harmless because the jury was able to consider a more complete
5  version of the video depositions.

6                    2. Fauble's Employment Record

7         F&G's direct examination of Mr. Klawitter, Key Tronic's corporate representative at trial, made
8  reference to two items in Mr. Fauble's personnel record. Key Tronic claims that these items were
9  prejudicial character evidence and warrant a new trial. The first was an off-hand remark in a Key
10 Tronic memo about Fauble's "perceived lack of credibility." The second involved an investigation by
11 the company into an alleged disclosure of confidential financial information. In both circumstances,
12 Key Tronic had an opportunity to cross-examine the witness to reveal the weakness of the evidence, and
13 in particular with respect to the latter allegation of dishonesty, it showed that Fauble was ultimately
14 cleared of any wrongdoing. Thus, the jury was able to view the character evidence in its proper
15 perspective and make a judgement as to its impact on the witness' credibility. If the admission of
16 evidence was improper, it was harmless because it was only a small part of F&G's attack on Fauble's
17 credibility, which focused on his demeanor and evasiveness during the video deposition, inability to
18 recall the December 8, 1993, meeting and failure to return telephone calls after that meeting.

19
20                   3. Incomplete Audio Transcript

21        During the Plaintiffs' rebuttal testimony, an audio tape recording of a telephone conversation
22 between Fernando Falcon and Chuck Fauble was played to the jury. The recording itself began shortly
23 after the start of the conversation and appears to have excluded a portion of the conversation that was
24 referred to in Fauble's first recorded statements. While Key Tronic was deprived of the opportunity to
25 present the full context of the conversation, it was equally clear to the jury that the conversation was

26 ORDER – 10

incomplete. From this information, the jury was able to make a competent decision about the proper weight to afford the evidence, and a new trial is not warranted.

### D. Conclusion

The trial in this case took place over six days, and the jury deliberated for approximately two and a half more days before reaching its verdict. The Court is confident that the jury's deliberations were guided by a full and fair presentation of both parties' evidence and finds no basis for overturning the verdict or awarding a new trial. Defendant's Motion for New Trial is therefore DENIED.

## III. PLAINTIFFS' MOTION TO AMEND JUDGMENT

The NDA between F&G and Key Tronic contains a choice of law provision designating Minnesota law as controlling authority. (See McCune Decl. Ex. A ¶ 9.) Minnesota law requires an award of prejudgment interest whenever a judgment results in pecuniary damages. See Minn. Stat. § 549.09(b). According to Plaintiffs' expert's calculations, $2,685,899 in interest accrued at the prevailing interest rates between the filing of the Complaint on November 30, 1998, and the entry of judgment in favor of Plaintiffs on January 2, 2002. (See McCune Decl. Ex. C.)

Plaintiffs' Motion is GRANTED and the judgment is amended to include $2,685,899 in prejudgment interest, bringing the total award to $19,185,899.

## IV. CONCLUSION

Defendant's Renewed Motion for Judgment as a Matter of Law is DENIED. Defendant's Motion for New Trial is DENIED. Plaintiffs' Motion to Amend Judgment is GRANTED.

ORDER – 11

1    The Clerk is directed to AMEND the Judgment entered January 2, 2002 (Dkt. No. 378) to add

2   $2,685,899 in prejudgment interest, bringing the total award to $19,185,899.

3

4

5

       SO ORDERED this ____ day of May, 2002.

6

7

8                                        _____

                                         CHIEF UNITED STATES DISTRICT JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ORDER – 12